# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 17, 2008

Charles R. Fulbruge III
Clerk

No. 06-20321

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

SCOTT YEAGER

Defendant - Appellant

-------------------------------------------------------------------------------------------------

Consolidated with
No. 06-20593

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

REX SHELBY

Defendant - Appellant

-------------------------------------------------------------------------------------------------

Consolidated with
No. 06-20691

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

JOSEPH HIRKO

Defendant - Appellant

No. 06-20321

---

Appeals from the United States District Court
for the Southern District of Texas

---

Before HIGGINBOTHAM, GARZA, and BENAVIDES, Circuit Judges.

FORTUNATO P. BENAVIDES, Circuit Judge:

This is a consolidated interlocutory appeal of an order denying a motion to dismiss a government indictment under the doctrine of collateral estoppel.[1] In 2005, Defendants F. Scott Yeager, Joseph Hirko, and Rex Shelby ("Defendants") were tried on various counts for their actions while employed at Enron Broadband Services ("EBS"). The jury acquitted Defendants on some of these counts but hung on others, after which the United States ("Government") again indicted Defendants on some of the mistried counts. Contending that the acquitted counts collaterally estopped the Government from pursuing the mistried counts, Defendants moved to dismiss the indictment. The district court denied the motion. For the reasons below, we AFFIRM.

I.

This case arises from the collapse of Enron Corporation ("Enron") and its subsidiaries. Defendants were senior executives at EBS, Enron's broadband and telecommunications unit. In November 2004, Defendants were indicted on various counts of: (1) conspiracy to commit securities and wire fraud, (2) securities fraud, (3) wire fraud, (4) insider trading, and (5) money laundering.[2]

---

[1] We have jurisdiction over this case under 28 U.S.C. § 1291. Abney v. United States, 431 U.S. 651, 659 (1977) ("Although it is true that a pretrial order denying a motion to dismiss an indictment on double jeopardy grounds lacks the finality traditionally considered indispensable to appellate review, we conclude that such orders fall within the small class of cases that Cohen [sic] placed beyond the confines of the final-judgment rule.") (internal quotation marks omitted).

[2] Defendants Yeager, Hirko, and Shelby were all charged with one count of conspiracy to commit securities and wire fraud, 18 U.S.C. § 371, one count of securities fraud, 15 U.S.C. §§ 78j(b) and 78ff, and four counts of wire fraud, 18 U.S.C. § 1343. In addition, Yeager was

2

In 1998, Enron began developing an "intelligent" telecommunications network and associated software. The indictment alleged that Defendants purposely sought to deceive the public by making false statements about EBS's progress and financial condition. According to the indictment, Defendants made false claims in various press releases beginning in 1999 and at Enron's annual analyst conference in January 2000. The indictment also charged Defendants with selling millions of dollars of Enron stock while making these false statements.

In July 2005, the jury acquitted Defendants on some counts but could not reach a verdict on others. Yeager was acquitted of the conspiracy, wire fraud, and security fraud counts. Hirko was acquitted of some of the insider trading and money laundering counts; and Shelby was acquitted of some of the insider trading counts. Because the jury hung on the remaining counts, the district court declared a mistrial on those counts. The district court also granted Shelby's Rule 29 motion for judgment of acquittal on the money laundering counts and the wire fraud counts.[3]

In November 2005, the Government obtained new indictments against Defendants. These post-trial indictments recharged Shelby and Hirko with all of the mistried counts and recharged Yeager with some of the mistried insider trading and money laundering counts. The indictments recharged Yeager with five counts of insider trading and eight counts of money laundering; Hirko with one count of conspiracy, one count of securities fraud, and five counts of insider trading; and Shelby with one conspiracy count, one securities fraud count, and

---

charged with 20 counts of insider trading and 99 counts of money laundering. Shelby was charged with eight counts of insider trading and six counts of money laundering. Hirko was charged with 7 counts of insider trading and 14 counts of money laundering.

[3] Rule 29 of the Federal Rules of Criminal Procedure states in relevant part: "If the jury has failed to return a verdict, the court may enter a judgment of acquittal." Fed. R. Crim. P. 29(c)(2).

four counts of insider trading. Shelby and Hirko moved to dismiss all of the recharged counts, except for the conspiracy counts against Hirko and Shelby and the 2001 insider trading counts against Hirko. Yeager moved to dismiss all of the mistried insider trading and money laundering counts.[4] Defendants contend that their previous acquittals collaterally estopped the Government from pursuing these charges. The district court denied their motion.

## II.

Whether collateral estoppel bars a subsequent criminal prosecution is a question of law that we review de novo. United States v. Brackett, 113 F.3d 1396, 1398 (5th Cir. 1997).

## III.

The Fifth Amendment's guarantee against double jeopardy incorporates the collateral estoppel doctrine. Ashe v. Swenson, 397 U.S. 436, 443-44 (1970). Collateral estoppel "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." Id. at 443. As traditionally understood, the Double Jeopardy Clause precludes multiple prosecutions and multiple punishments for the same offense. See United States v. Odutayo, 406 F.3d 386, 392 (5th Cir. 2005). Ashe, however, limits successive prosecution of defendants, not for the same offenses but for

---

[4] In addition to the recharged counts, Yeager moved to dismiss the mistried counts in the indictment the Government secured before the trial ("the old indictment") but not in the November 2005 indictment ('the new indictment"). The Government maintains that it can prosecute Yeager under both the new and old indictments and, therefore, can retry him on all of the insider trading and money laundering counts. Therefore, Yeager moved to dismiss both indictments, contending that collateral estoppel precludes the Government from retrying him on any of the mistried counts. Because the Government does not dispute Yeager's contention that the collateral estoppel analysis is the same for all of the mistried counts, we do not differentiate between the two indictments here.

different offenses.[5]  After an acquittal, <u>Ashe</u> bars the government from prosecuting defendants on a different charge "if one of the facts <u>necessarily determined</u> in the former trial is an essential element of the subsequent prosecution."  <u>Brackett</u>, 113 F.3d at 1398.  Defendants asserting collateral estoppel carry the burden to make this showing.  <u>Dowling v. United States</u>, 493 U.S. 342, 350 (1990) ("The Court of Appeals have unanimously placed the burden on the defendant to demonstrate that the issue whose relitigation he seeks to foreclose was actually decided in the first proceeding.").

To determine whether collateral estoppel bars a subsequent criminal prosecution, courts must conduct a two-step analysis.  <u>Bolden v. Warden, W. Tenn. High Sec. Facility</u>, 194 F.3d 579, 584 (5th Cir. 1999).  "Initially, we must decide which facts necessarily were decided in the first proceeding.  Then we must consider whether the facts necessarily decided in the first trial constitute essential elements of the offense in the second trial."  <u>Id.</u>  Here, Defendants assert collateral estoppel bars the Government from pursuing all of the current charges against them, except for the conspiracy counts against

---

[5] In <u>Ashe</u>, masked gunmen robbed a group of men playing poker at a residence.  <u>Ashe</u>, 397 U.S. at 437.  The government alleged that the defendant was one of the gunmen and charged the defendant with the armed robbery of one of the players.  <u>Id.</u> at 438.  Neither party disputed the facts that an armed robbery had occurred and that the gunmen had taken the victim's property.  <u>Id.</u>  The only dispute was whether the defendant was one of the robbers.  <u>See id.</u>  After the jury acquitted the defendant for lack of sufficient evidence, the government prosecuted him for robbing one of the other poker players.  <u>Id.</u> at 439.  According to the Court, "the jury by its verdict found that he had not [been one of the robbers]," and, under the doctrine of collateral estoppel, the second prosecution was impermissible.  <u>Id.</u> at 445.

Hirko and Shelby and the 2001 insider trading counts against Hirko.[6] We engage in this two-step analysis as to each defendant's claims below.[7]

A. Rex Shelby

Shelby was acquitted of the four insider trading counts related to his sale of Enron stock in the summer of 2000 ("Summer 2000 Insider Trading Counts"). The jury hung on the conspiracy to commit securities and wire fraud count, the securities fraud count, the four wire fraud counts, the four insider trading counts related to trades he conducted between January and March 2000 ("Early 2000 Insider Trading Counts"), and all the money laundering counts. After the jury rendered its verdict, the district court granted Shelby's Rule 29 motion for judgment of acquittal on the money laundering counts and the wire fraud counts. Shelby now contends that, under collateral estoppel, these acquittals preclude the Government from retrying him on the securities fraud count and the Early 2000 Insider Trading Counts. This argument is unpersuasive.[8]

 1. Jury Acquittals

---

[6] For convenience purposes, we will refer to all of the counts that Defendants seek to dismiss as the "mistried counts" from this point onward. We recognize that the jury also hung on the conspiracy counts against Defendants Hirko and Shelby and the 2001 insider trading counts against Hirko. But because Defendants Hirko and Shelby do not seek their dismissal, these counts are not at issue here and are, therefore, omitted from our discussion.

[7] While Defendants all argue that collateral estoppel bars a retrial, the specifics of each defendant's argument are different. In this case, each defendant was acquitted of different counts and now seeks to dismiss different counts. Therefore, we must analyze each defendant's collateral estoppel argument separately.

[8] Shelby does not contend that collateral estoppel applies to the conspiracy to commit securities and wire fraud count. Shelby argues, however, that, if we decided that collateral estoppel precludes the Government from retrying him on the securities fraud and the Early 2000 Insider Trading Counts, then collateral estoppel also would bar the Government from introducing some evidence in a retrial of the conspiracy count. Because we find that collateral estoppel does not bar a retrial of any of the mistried counts, we do not address this issue here.

Based on his review of the record, Shelby claims that the jury necessarily came to one of three potential conclusions when it acquitted him of the Summer 2000 Insider Trading Counts: (1) he did not withhold material information from the public, (2) there was no scheme to defraud, or (3) he lacked the intent to defraud. Because any one of these findings would bar the Government from prosecuting him on the securities fraud count and the Early 2000 Insider Trading Counts, Shelby seeks dismissal of these counts.

After an extensive examination of the record, we conclude that the jury could have acquitted Shelby of the Summer 2000 Insider Trading Counts on another basis: it determined that he did not "use" undisclosed, material information when he made the sales. Shelby testified that he sold shares of his Enron stock in 2000 because he was uncomfortable with being in the stock market and that he relied on his friend David Berberian's advice as to when to sell. Moreover, in the summer of 2000, Shelby immediately exercised options that vested and promptly sold the shares that he received. Because Shelby sold those shares as soon as possible, the jury could have concluded that Shelby conducted the summer 2000 trades due to his discomfort with the stock market.[9]

Shelby argues that the jury could not have acquitted him on this basis because the jury instructions did not explain the relevance of "using" insider information to insider trading. According to Shelby, the elements of insider trading do not include the word "uses," and the district court's explanation of the word "uses" does not immediately follow its instruction on the elements of insider trading.

---

[9] Shelby conducted four trades in June and July of 2000. He sold shares of Enron stock on June 26, June 27, June 29, and July 19. The sale on July 19 involved options different from those involved in the June sales, which vested in late June. It is not clear from the record, however, when the options Shelby exercised in July vested. But because the July sale was so close in time to the June sales, we find that the jury could have reasonably decided that all of the summer 2000 trades were motivated by Shelby's distrust of the stock market.

We reject Shelby's selective reading of the jury instructions. In the jury instructions related to insider trading, the district court stated that "the law forbids [a person possessing insider information] from using that insider information in buying or selling the securities in question." The district court further explained that "[a] person 'uses' material, non-public information in connection with a stock purchase or sale if that information is a factor in his decision to purchase the stock." Therefore, these instructions were clear that the jury had to acquit Shelby of insider trading if it did not find that Shelby both: (1) had insider information and (2) was motivated by this information when he traded.

Because we find that the jury could have acquitted Shelby of the Summer 2000 Insider Trading Counts by concluding that these trades were not motivated by insider information, collateral estoppel does not preclude a retrial of the Early 2000 Insider Trading Counts and the securities fraud count. Shelby is correct that collateral estoppel would bar the Government from retrying Shelby on the Early 2000 Insider Trading Counts if the jury determined that he also did not use insider information when he conducted these trades. The jury, however, did not necessarily make this finding. In acquitting Shelby of the later counts, the jury could have differentiated between the two different sets of trades. The jury could have found that Shelby did not use insider information when he conducted the trades that underlie the Summer 2000 Insider Trading Counts but did use insider information when he conducted the trades that underlie the Early 2000 Insider Trading Counts.

The evidence at trial supports this distinction. In the summer of 2000, Shelby traded after exercising options as soon as they vested. But from January through March of 2000, Shelby traded after exercising options that vested in June 1999. From this delay, the jury could have rationally

concluded that Shelby purposely waited for the stock price to go up before exercising his 1999 options and that Shelby knew the price would go up because of his knowledge of insider information.[10] In contrast, Shelby exercised his 2000 options immediately after they vested. Thus, because the jury could have made this timing distinction, it did not necessarily make a factual determination that would bar a subsequent prosecution on the Early 2000 Insider Trading Counts.[11]

Similarly, the four insider trading acquittals do not estop the Government from retrying Shelby for securities fraud. As discussed above, the jury could have acquitted Shelby of the four insider trading counts because it concluded that he did not use insider information in making the underlying trades. But this determination is not dispositive as to whether Shelby engaged in securities fraud. "Using" insider information in making trades is not an element of securities fraud.[12] Therefore, because the jury

---

[10] Shelby alleges that he did not exercise his 1999 options immediately after they vested because the market price of Enron stock at the time was lower than the option strike price. Moreover, Shelby contends that he exercised these options in 2000 when "they now had value." But evidence indicates that Enron stock "had value" long before the time he conducted his trades. The price of Enron stock began to rise precipitously in late November 1999. Therefore, Shelby's argument is unpersuasive because Shelby could have exercised those options in late 1999 instead of waiting until the stock price was well above the strike price.

[11] Shelby alleges that the jury could not have made a timing distinction when it acquitted him of the Summer 2000 Insider Trading Counts because neither the Government nor Shelby argued this distinction at trial. Moreover, Shelby points out that he had the same defense against all the insider trading counts: he traded because he was uncomfortable in the stock market, and he followed the advice of his friend, Berberian. From the evidence presented at trial, however, we find that the timing distinction is obvious and one that the jury could have made on its own. Therefore, the jury could have accepted Shelby's defense for one set of counts and not the other.

[12] The district court instructed the jury that it could convict Defendants of securities fraud if it found that the Government had proven three essential elements beyond a reasonable doubt:
> First: That in connection with the purchase or sale of Enron stock, the defendant did any one or more of the following:
> (1) employed a device, scheme, or artifice to defraud as charged

9

could have acquitted Shelby by concluding that he did not use insider information, Shelby has not shown that the jury necessarily made a factual determination that would bar a retrial of the securities fraud count.

2. Rule 29 Acquittals

We reject Shelby's contention that his Rule 29 wire fraud acquittals collaterally estop the Government from retrying him on insider trading or securities fraud. After the jury rendered its verdict, the district court granted Shelby's Rule 29 motion for judgment of acquittal on the money laundering counts and the wire fraud counts.[13] While Rule 29 acquittals may collaterally estop the government from bringing a subsequent prosecution, see United States v. Bernhardt, 840 F.2d 1441, 1447-48 (9th Cir. 1988), we find that they do not preclude a retrial in this case.

As with jury acquittals, Rule 29 acquittals collaterally estop the government from relitigating only the factual issues that were necessarily decided to reach the verdict. See id. at 1448. Because courts issue Rule 29 acquittals, collateral estoppel in this scenario applies to the factual determinations the court, and not the jury, made to acquit. Here, the district court granted Shelby's Rule 29 motion for judgment of acquittal on the wire

---

in the Indictment; or

(2) made any untrue statement of a material fact, or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading as charged in the Indictment; or

(3) engaged in an act, practice, or course of conduct that operated, or would operate, as a fraud and deceit on any person as charged in the Indictment;

Second: That the defendant acted willfully, knowingly, and with the intent to defraud; and

Third: That the defendant used, or caused to be used, any means or instrumentality of interstate commerce or of the mails.

[13] Shelby does not allege that the Rule 29 money laundering acquittals have any collateral estoppel effect.

fraud counts because it found that there was no evidence that Shelby had any involvement with the allegedly fraudulent press releases underlying those counts. According to the district court, the Government could not prove that Shelby used interstate wire communications facilities to carry out an illegal scheme without this evidence.[14] Whether Shelby used interstate wire communications, however, is not essential to either insider trading or securities fraud. Therefore, we find that the Rule 29 wire fraud acquittals do not bar the Government from retrying the remaining insider trading counts or the securities fraud count.[15]

B. Joseph Hirko

Hirko was acquitted of twelve counts of money laundering related to monetary transactions he conducted in 2000 ("the Money Laundering Counts") and two counts of insider trading related to his sale of Enron stock in February and April 2000. The jury hung on the conspiracy to commit

---

[14] At trial, the district court instructed the jury that it could convict Defendants of wire fraud only if the Government proved:
> First: That the defendant[s] knowingly devised or intended to devise a scheme to defraud, as described in the indictment;
> Second: That the defendant[s] acted with a specified intent to defraud;
> Third: That the defendant[s] used or caused another person to use interstate wire communications facilities for the purpose of carrying out the scheme; and
> Fourth: That the scheme to defraud employed false material representations.

[15] Shelby asserts that the absence of evidence that he participated in the press releases establishes that he was not part of a scheme to defraud, rather than that he did not use interstate wire communications facilities. According to Shelby, he stipulated to having used interstate communications at trial. Therefore, he argues that the district court should have granted his Rule 29 motion for judgment of acquittal on the wire fraud counts by finding that he was not involved in a scheme to defraud. Moreover, he contends that we should apply collateral estoppel using this finding instead of the one the district court actually made.

Shelby's argument lacks merit. The district court was clear that it granted Shelby's Rule 29 motion because it found that he did not use interstate communications. Even assuming that Shelby is correct that the district court erred in making this finding, Shelby cites no case law that allows us to apply collateral estoppel based on what the court should have found instead of what it explicitly claimed to have found.

securities and wire fraud count, the securities fraud count, four counts of wire fraud, and five counts of insider trading. Hirko now contends that the acquittals on the 2000 Money Laundering Counts collaterally estop the Government from retrying him on the securities fraud count, the wire fraud counts, and the two remaining insider trading counts related to his May 2000 trades.[16] We find Hirko's argument unconvincing.

To acquit him on the Money Laundering Counts, Hirko contends, the jury must have found that he did not engage in insider trading when he sold shares of Enron stock in May 2000 or commit securities fraud or wire fraud. A party commits money laundering by "knowingly engag[ing] in a monetary transaction in criminally derived property of a value greater than $10,000." United States v. Freeman, 434 F.3d 369, 377 (5th Cir. 2005). At trial, Hirko stipulated to having engaged knowingly in monetary transactions involving more than $10,000. Both parties also acknowledged that the bulk of the funds involved in the transactions underlying the Money Laundering Counts came from Hirko's sale of Enron stock in 2000. Therefore, Hirko argues, the only issue the jury had to decide to convict him on the Money Laundering Counts was whether his sale of Enron stock was unlawful, making these funds "criminally derived." Because of the way the Government tried the case, Hirko alleges that the jury could have found that his 2000 sales were unlawful if it concluded that he committed securities fraud, wire fraud, or insider trading.

While the Government charged him with having committed various different types of fraud, Hirko argues that the Government contended at trial that all of these fraudulent acts were part of a grand scheme to defraud the

---

[16] Because Hirko does not contend that collateral estoppel bars the Government from retrying him on insider trading related to his 2001 trades, we do not address these counts here. Therefore, when we refer to "insider trading" as it relates to Hirko, we are referring only to insider trading related to his 2000 trades.

investing public. According to Hirko, the Government claimed that Defendants made material misrepresentations and omissions, thereby committing securities fraud and wire fraud, to "pump Enron's stock price" so that they could then profit from insider trading by selling their shares of Enron stock at the artificially inflated price. Under the Government's theory, all of Hirko's allegedly fraudulent acts played a role in generating the funds involved in the Money Laundering Counts, and Hirko contends that the district court instructed the jury to that effect.[17] In the jury instructions for money laundering, the district court explained that funds were criminally derived in this case if the jury determined that Hirko transacted in funds resulting from wire fraud, securities fraud, or insider trading. Therefore, Hirko contends that the jury could have acquitted him of the Money Laundering Counts only by finding that he did not commit securities fraud, wire fraud, or insider trading.

Hirko's argument falls under its own weight. Under the jury instructions for money laundering, the Government must prove that the funds transacted were "derived from a specified unlawful activity," which the district court defined as "wire fraud" or "fraud in the sale of securities."

---

[17] The district court instructed the jury that it could convict Defendants of money laundering if it found that the Government had proven five essential elements beyond a reasonable doubt:

First: That the defendant engaged or attempted to engage in a monetary transaction;

Second: That the monetary transaction involved criminally derived property of a value greater than $10,000;

Third: That the property was in fact derived from a specified unlawful activity, that is, wire fraud in violation of Title 18, United States Code, Section 1343, and fraud in the sale of securities in violation of Title 15, United States Code, Sections 78j(b) and 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5;

Fourth: That the defendant acted knowingly, that is, with knowledge that the transaction involved proceeds of a criminal offense; and

Fifth: That the transaction took place in the United States.

Because Hirko stipulated to the other elements, he contends that the jury concluded that he did not commit any of these acts when it acquitted him of the Money Laundering Counts. But Hirko's analysis is flawed because, under his argument, the jury must find that he committed "a specified unlawful activity" as a precondition to convicting him on the Money Laundering Counts. Thus, if the jury could not decide whether Hirko committed "a specified unlawful activity," then it would have to acquit him on the Money Laundering Counts.

In fact, that is seemingly what happened here. In addition to money laundering, Hirko was also charged with securities fraud, wire fraud, and insider trading, and the jury hung on these counts. Since it could not determine whether Hirko committed these acts, the jury then could not convict Hirko on the Money Laundering Counts and had to acquit. Because Hirko has failed to show that the jury necessarily found that he did not commit fraud or insider trading, collateral estoppel does not bar the Government from retrying Hirko on the securities fraud, wire fraud, and the insider trading counts.

C.  F. Scott Yeager

Yeager was acquitted of securities fraud, four counts of wire fraud, and conspiracy to commit securities fraud and wire fraud. The jury hung on 20 counts of insider trading and 99 counts of money laundering. Yeager now argues that, in acquitting him, the jury necessarily found that he did not have insider information, and, therefore, collateral estoppel bars the Government from retrying him on insider trading and money laundering. For the reasons below, we find that Yeager is correct that the jury, acting rationally, could have acquitted Yeager on securities fraud only by concluding that he did not have insider information. But because Yeager was also charged with insider trading and money laundering and the jury hung on those counts, we find

that collateral estoppel, under our precedent, does not bar a retrial in this case.

### 1. Securities Fraud

Considering only the jury instructions, we conclude that there are four rational bases the jury could have used to acquit Yeager on securities fraud. The Government charged Yeager with securities fraud for making material misrepresentations or omissions at the 2000 analyst conference. As discussed above, the district court instructed the jury that it could convict Yeager on securities fraud only if it determined that the Government had proven three elements beyond a reasonable doubt: (1) Yeager participated in making material misrepresentations or omissions; (2) Yeager acted "willfully, knowingly, and with the intent to defraud"; and (3) Yeager used "[a] means or instrumentality of interstate commerce or of the mails." Because neither party contends that the third element is at issue, the jury must have decided, in acquitting Yeager, that the Government did not carry its burden as to the first or second elements. Two reasons the Government might not have succeeded in carrying its burden as to the first element are: (1) it failed to show there were misrepresentations or omissions made at the analyst conference; or (2) it failed to show that Yeager participated in making material misrepresentations or omissions. Two reasons the Government might not have succeeded in carrying its burden as to the second element are: (1) it failed to show that Yeager knew the presentations given at the analyst conference were fraudulent when they were made; or (2) it failed to show that any misrepresentations or omissions Yeager made were intentional rather than negligent.

After reviewing the record, we conclude that the jury could have acquitted Yeager on the basis of the first element by concluding that there were no misrepresentations or omissions made at the conference. At trial,

Defendants presented evidence that the conference presentations did not contain falsehoods and that the omitted information was not material so as to render the presentations misleading. The jury could have found this evidence convincing.

We also conclude, however, that the jury could not have acquitted Yeager by finding that, while there were misrepresentations or omissions made, Yeager did not participate in making them. While both parties acknowledge that Yeager did not give a presentation at the analyst conference, the Government argued strenuously at trial that Yeager helped shape the message of the conference presentations, which Yeager did not dispute. Under the jury instructions, Yeager participated in making material misrepresentations or omissions as long as he "caused the statement[s] to be made or the fact[s] to be omitted." Therefore, if the jury concluded that the presentations were fraudulent, the jury could not have acquitted Yeager on the grounds that he did not participate in the fraud.

From our examination of the record, we additionally find that the jury could have acquitted Yeager on the basis of the second element by finding that Yeager did not knowingly make misrepresentations and omissions because he believed the presentations were truthful. Yeager's main defense at trial was that he thought the conference presentations were truthful because of his good faith reliance on information that he received from others. Therefore, the jury could have acquitted Yeager for this reason.

We conclude, however, that the jury could not have acquitted Yeager for negligently making material misrepresentations or omissions. The district court instructed the jury that Defendants must have been at least reckless when making material misrepresentations or omissions to be guilty of securities fraud. But it was undisputed that Yeager, as Senior Vice President of Strategic Development, helped plan the conference message. Therefore, if

the jury determined that Yeager possessed information that contradicted the presentations, the jury could not have found that he was negligent in dispensing falsehoods to the public.

In sum, our review of the record demonstrates that the jury could have acquitted Yeager of securities fraud for two reasons: (1) there were no material misrepresentations or omissions made at the conference; or (2) Yeager did not knowingly make misrepresentations or omissions because he believed the presentations were truthful. Under either rationale, the jury must have found when it acquitted Yeager that Yeager himself did not have any insider information that contradicted what was presented to the public.[18] The insider trading counts are based on allegations that Yeager had insider information when he conducted his trades because he knew that the information released to the public was fraudulent. Therefore, the jury seemingly made a finding that precludes the Government from now prosecuting him on insider trading and money laundering.[19] Accordingly, when we consider the acquittals by themselves, it appears that Yeager is correct that collateral estoppel bars a retrial.[20]

---

[18] The Government did not contend at trial nor does it contend here that Yeager could have discovered insider information after the conference. Therefore, if the jury found that Yeager did not have insider information at the conference, it must also have found that he did not have insider information when he conducted his trades in the subsequent months.

[19] Yeager is charged with money laundering based on transacting in money generated from trades he conducted allegedly on the basis of insider information. Therefore, the finding that Yeager did not have insider information would also preclude the Government from retrying him for money laundering.

[20] Yeager also was acquitted of four counts of wire fraud and conspiracy to commit securities fraud and wire fraud. Yeager argues that, in acquitting him of these counts, the jury must also have found that he did not possess insider information. Because we determine that Yeager is correct that the jury must have so concluded when it acquitted him of securities fraud, it is unnecessary for us to determine whether the jury made the same conclusion when it acquitted Yeager of these other counts.

The problem in this case, however, is that the same jury hung on the insider trading counts. If Yeager is correct that the jury found that he did not have insider information, then the jury, acting rationally, would also have acquitted Yeager of the insider trading counts. Thus, when we consider the hung counts along with the acquittals, we are faced with a potential inconsistency, making it impossible for us to decide with any certainty what the jury necessarily determined. Whether we can weigh hung counts in applying collateral estoppel then is crucial to our analysis. Because, as discussed below, we conclude that our precedent dictates that we must, we find that we cannot apply collateral estoppel in this case.

### 2. United States v. Larkin

We have addressed before the question of how collateral estoppel applies when the jury acquitted on some counts but hung on related counts. In United States v. Larkin, we rejected the defendant's assertion that the jury necessarily determined that he was not part of a conspiracy when it hung on the conspiracy count but acquitted him of various counts of vicarious liability. 605 F.2d 1360, 1370 (5th Cir. 1979), withdrawn in part on other grounds, 605 F.2d 585 (5th Cir. 1980). In applying Ashe, the Larkin court laid out the various rational bases on which the jury could have acquitted the defendant. Id. We then ruled out the possibility that the jury acquitted the defendant of vicarious liability because it found that he was not a member of a conspiracy. Id. at 1370-71. According to the Court, "No rational jury could have absolved [him] of [vicarious liability] because of the absence of a conspiracy between the two, while it simultaneously failed to acquit him on the conspiracy charge itself." Id. Therefore, Larkin requires that we consider mistried counts in our collateral estoppel analysis; and, in particular, under Larkin, the presence of mistried counts diminishes the likelihood that, in acquitting defendants on related counts, the jury made a factual determination that bars a retrial.

Yeager contends that collateral estoppel precludes the Government from retrying him for insider trading and money laundering. According to Yeager, the jury necessarily determined that he did not have insider information when it acquitted him and that no jury can convict him on insider trading and money laundering if he did not have insider information. But even if Yeager is correct that the jury could have acquitted him on the fraud and conspiracy counts only if it found that he did not have insider information, that does not end our inquiry as to what the jury necessarily decided at trial because, under <u>Larkin</u>, we must also take into consideration the mistried counts. As we similarly noted in <u>Larkin</u>, if Yeager is correct that the jury found that he did not have insider information, then the jury, acting rationally, would have acquitted him of insider trading and money laundering. Instead, the jury hung.

The result is a discrepancy that has four possible explanations. One possibility is that the jury was irrational and came to two inconsistent conclusions. When considering the fraud and conspiracy counts, the jury decided that Yeager did not have insider information. When considering the insider trading and money laundering counts, the jury decided that Yeager had insider information but hung for other reasons. Another possibility, as the Government speculates, is that the jury decided that Yeager had insider information when considering both sets of counts, but, for some unknown reason, it nonetheless acquitted Yeager on some of them. A third possibility is that the jury decided that Yeager did not have insider information when considering both sets of counts, but, for some unknown reason, it failed to push all of them through to acquittals. Finally, a fourth possibility is that the jury decided that Yeager did not have insider information when it acquitted him on the fraud and conspiracy counts and simply did not reach the issue

when it considered the hung counts because it could not agree on whether the Government had carried its burden as to the other elements.

Because it is impossible to determine why the jury hung, we find that collateral estoppel does not bar a retrial in this case. In the first scenario, collateral estoppel would not bar a retrial because, if the jury irrationally came to two inconsistent conclusions, we cannot say that it came to any definitive conclusion. In the second scenario, collateral estoppel would not bar a retrial because the jury found that Yeager had insider information. In the third and fourth scenarios, however, collateral estoppel would preclude a retrial because the jury concluded that Yeager did not have insider information. Under Ashe, however, the burden is on defendants to show that the jury necessarily determined the issue that they seek to foreclose. Brackett, 113 F.3d at 1398. Given the evidence at trial, whether Yeager had insider information was a close issue, and the jury could have come to the conclusions in any of these four scenarios. Therefore, we cannot determine with any certainty which scenario Yeager's case falls under, and we cannot conclude what the jury necessarily decided. Because Yeager failed to carry his burden and establish what the jury necessarily decided, we find that collateral estoppel does not bar the Government from retrying Yeager on the insider trading and money laundering counts.

3. United States v. Powell

Finally, we note that we are not extending, at the Government's urging, United States v. Powell, 469 U.S. 57 (1984), to preclude applying collateral estoppel where a jury acquitted defendants on some counts but hung on related counts. Many of our sister circuits have rejected this argument in similar cases. United States v. Ohayon, 483 F.3d 1281, 1289 (11th Cir. 2007); United States v. Romeo, 114 F.3d 141, 144 (9th Cir. 1997); United States v. Bailin, 977 F.2d 270, 276 (7th Cir. 1992); United States v. Frazier, 880 F.2d

878, 883 (6th Cir. 1989). Contra United States v. White, 936 F.2d 1326 (D.C. Cir. 1991). Because our finding does not rely on Powell, however, these cases do not affect our analysis.

Powell bars applying collateral estoppel in cases where there are inconsistent verdicts. In Powell, the Court found that collateral estoppel cannot apply to reverse a conviction when the jury both acquitted and convicted defendants of related counts.[21] Powell, 469 U.S. at 68. According to the Court, the doctrine of collateral estoppel is "no longer useful" when the same jury reached inconsistent verdicts because collateral estoppel is "predicated on the assumption that the jury acted rationally and found certain facts in reaching its verdict." Id.

In the cases before our sister circuits, the Government has argued, as it does here, for an extension of Powell. The Government maintains that Powell precludes applying collateral estoppel in cases where the jury acquitted defendants on some counts but hung on related counts because this result is also inconsistent. The Sixth, Seventh, Ninth, and Eleventh Circuits rejected this argument because they found that acquittals are not inconsistent with mistried counts. Ohayon, 483 F.3d at 1289; Romeo, 114 F.3d at 144; Bailin, 977 F.2d at 279-80; Frazier, 880 F.2d at 883. As the Sixth Circuit noted, "[n]o such inconsistency is necessarily present" because "[b]oth the acquittal and the failure to agree could result from a number of factors." Frazier, 880 F.2d at 883.

While we arrive at what appears to be a contrary decision, we do not disagree with our sister circuits. As we acknowledged above, there are four

---

[21] In Powell, the defendant was acquitted of various drug felonies but convicted of facilitating those felonies. 469 U.S. at 60. Because an element of the facilitation counts is that she committed the felonies that she allegedly facilitated, the defendant argued that collateral estoppel required overturning the convictions. See id. at 68. The Court found the defendant's argument unconvincing. Id.

possibilities as to how to reconcile Yeager's acquittals with the mistried counts, and only in one of these possibilities must the jury have been inconsistent. In short, we concur with our sister circuits that it is impossible to discern definitively why a jury hung. Therefore, we also reject the Government's argument because it requires us to necessarily find an inconsistency where one may not exist.

Where we part ways with our sister circuits is that they ignored the mistried counts after they determined that Powell does not apply. Because our precedent dictates that we weigh mistried counts, however, we cannot do the same. Under Ashe, the burden is on defendants to show that the jury necessarily determined the issue they seek to foreclose in their favor. Therefore, collateral estoppel cannot apply if the uncertainty raised by the mistried counts, which we must consider under Larkin, precludes Yeager from meeting this burden. For the reasons above, we find that it does.[22] In sum, we agree with our sister circuits that Powell does not bar applying collateral estoppel when a jury acquitted defendants on some counts but hung on related counts. But we conclude that Ashe precludes applying collateral estoppel in this scenario because Yeager has failed to show that the jury necessarily determined that he did not have insider information.

## IV.

For the aforementioned reasons, we AFFIRM the district court's denial of Defendants' motion to dismiss under the doctrine of collateral estoppel.

---

[22] We can only speculate as to why our sister circuits did not also consider the mistried counts in its analysis under Ashe. While our precedent requires us to weigh mistried counts in determining whether collateral estoppel applies under the Ashe framework, the other circuits may not be similarly bound by their precedent.